In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-397 CR


____________________



WALTER HARVEY BALLARD, JR., Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 411th District Court


San Jacinto County, Texas


Trial Cause No. 8246






MEMORANDUM TO CLERK 


 You are directed to make the following correction in the Opinion dated May 14,
2003:

 On page 23, the next to the last line, second word "believe" should be changed to
the word, "believed."

 You will give notice of this correction in the original Opinion by sending a copy of
the corrected page accompanied by this memorandum to all interested parties who received
a copy of the original Opinion.

 Entered this the 28th day of May, 2003. 


 PER CURIAM


In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-397 CR


____________________



WALTER HARVEY BALLARD, JR., Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 411th District Court


San Jacinto County, Texas


Trial Cause No. 8246






OPINION


 A jury convicted appellant of the offense of Manufacture of a Controlled Substance. 
See Tex. Health & Safety Code Ann. § 481.112(a), (d) (Vernon Supp. 2003). The
jury further assessed punishment at confinement in the Texas Department of Criminal
Justice - Institutional Division for a term of sixteen years and one day. Appellant
represented himself at all phases of the trial. Appellate counsel now prosecutes the instant
appeal on appellant's behalf. We are presented with three appellate issues, the second of
which will be dispositive of the appeal. It reads, "The search of the appellant's home was
performed illegally as the officers failed to knock and announce their presence prior to
entry." 

 The record reflects appellant filed numerous pretrial motions, one of which, a
suppression motion, raised the "knock and announce" issue. The issue was vigorously
litigated in a pretrial suppression hearing. At one point during testimony at the
suppression hearing, the State orally stipulated to the fact that announcement of the
presence of the police serving the search warrant at appellant's house "was made at the
same time the door was breached and entry was made[.]" Our careful examination of the
record indicates that at both the pretrial hearing and at trial, the State did not contest the
fact that the law enforcement officers serving the search warrant did not knock, announce
their presence and wait for a response from the occupants of the dwelling before breaking
the door in and entering. The authority for the "knock and announce" doctrine stems
primarily from two cases out of the United States Supreme Court, both unanimous
opinions: Wilson v. Arkansas, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995);
and Richards v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997).

APPLICABLE LAW 


 The purpose [of the Fourth Amendment's requirement of
reasonableness] is to preserve that degree of respect for the privacy of
persons and the inviolability of their property that existed when the provision
was adopted - - even if a later, less virtuous age should become accustomed
to considering all sorts of intrusions "reasonable."


Minnesota v. Dickerson, 508 U.S. 366, 380, 113 S.Ct. 2130, 124 L.Ed.2d 334, 348
(1993) (Scalia, J., concurring). In Wilson, the Court began its discussion of the legal
principles involved with the following:

 The Fourth Amendment to the Constitution protects "[t]he right of the
people to be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures." In evaluating the scope of this right,
we have looked to the traditional protections against unreasonable searches
and seizures afforded by the common law at the time of the framing. See
California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 1549-50, 113
L.Ed.2d 690 (1991); United States v. Watson, 423 U.S. 411, 418-420, 96
S.Ct. 820, 825-26, 46 L.Ed.2d 598 (1976); Carroll v. United States, 267
U.S. 132, 149, 45 S.Ct. 280, 283-84, 69 L.Ed. 543 (1925). "Although the
underlying command of the Fourth Amendment is always that searches and
seizures be reasonable," New Jersey v. T.L.O., 469 U.S. 325, 337, 105
S.Ct. 733, 740, 83 L.Ed.2d 720 (1985), our effort to give content to this
term may be guided by the meaning ascribed to it by the Framers of the
Amendment. An examination of the common law of search and seizure
leaves no doubt that the reasonableness of a search of a dwelling may depend
in part on whether law enforcement officers announced their presence and
authority prior to entering. 


Wilson, 514 U.S. at 931, 115 S.Ct. at 1916, 131 L.Ed.2d at 980. Later in its opinion, the
Court framed the holding, and its proper context, as follows:

 Our own cases have acknowledged that the common law principle of
announcement is "embedded in Anglo-American law," Miller v. United
States, 357 U.S. 301, 313, 78 S.Ct. 1190, 1198, 2 L.Ed.2d 1332 (1958), but
we have never squarely held that this principle is an element of the
reasonableness inquiry under the Fourth Amendment. We now so hold. 
Given the longstanding common-law endorsement of the practice of
announcement, we have little doubt that the Framers of the Fourth
Amendment thought that the method of an officer's entry into a dwelling was
among the factors to be considered in assessing the reasonableness of a
search or seizure. . . . 

 This is not to say, of course, that every entry must be preceded by an
announcement. The Fourth Amendment's flexible requirement of
reasonableness should not be read to mandate a rigid rule of announcement
that ignores countervailing law enforcement interests. As even petitioner
concedes, the common-law principle of announcement was never stated as
an inflexible rule requiring announcement under all circumstances. See Ker
v. California, 374 U.S. 23, 38, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726 (1963)
(plurality opinion) ("[I]t has been recognized from the early common law
that . . . breaking is permissible in executing an arrest under certain
circumstances")[.]


Id. at 934, 115 S.Ct. at 1918, 131 L.Ed.2d at 982. (footnote omitted). 

 In Richards, the Court examined a holding by the Wisconsin Supreme Court to the
effect that police are never required to knock and announce their presence when executing
a search warrant in a felony drug investigation. Richards, 520 U.S. at 387-88, 117 S.Ct.
at 1417, 137 L.Ed.2d at 620. The Court disagreed with the Wisconsin Supreme Court's
felony drug investigation "blanket exception" to the Fourth Amendment's knock and
announce requirement. Id. The decision of the Wisconsin Supreme Court relied on
numerous "criminal conduct surveys, newspaper articles, and other judicial opinions"
indicating that felony drug crimes involve "an extremely high risk of serious if not deadly
injury to the police as well as the potential for the disposal of drugs by the occupants prior
to entry by the police." Id. at 390, 117 S.Ct. at 1419, 137 L.Ed.2d at 621-22 (citing to
the Wisconsin Supreme Court's opinion. See State v. Richards, 201 Wis.2d 839, 549
N.W.2d 218, 223-27 (1996)). The Court itself acknowledged as "indisputable" that felony
drug investigations may frequently involve the threat of physical violence to the police
and/or the likelihood that drug evidence will be destroyed if advance notice were given. 
Richards, 520 U.S. at 391, 117 S.Ct. at 1419, 137 L.Ed.2d 622-23. Rejecting the
Wisconsin court's per se exception for felony drug investigations, the Court admonished:

 But creating exceptions to the knock-and-announce rule based on the
"culture" surrounding a general category of criminal behavior presents at
least two serious concerns.

 First, the exception contains considerable overgeneralization. For
example, while drug investigation frequently does pose special risks to
officer safety and the preservation of evidence, not every drug investigation
will pose these risks to a substantial degree. For example, a search could be
conducted at a time when the only individuals present in a residence have no
connection with the drug activity and thus will be unlikely to threaten
officers or destroy evidence. . . . 

 A second difficulty with permitting a criminal-category exception to
the knock-and-announce requirement is that the reasons for creating an
exception in one category can, relatively easily, be applied to others. Armed
bank robbers, for example, are, by definition, likely to have weapons, and
the fruits of their crime may be destroyed without too much difficulty. If a
per se exception were allowed for each category of criminal investigation
that included a considerable - - albeit hypothetical - - risk of danger to
officers or destruction of evidence, the knock-and-announce element of the
Fourth Amendment's reasonableness requirement would be meaningless. 

 Thus, the fact that felony drug investigations may frequently present
circumstances warranting a no-knock entry cannot remove from the neutral
scrutiny of a reviewing court the reasonableness of the police decision not
to knock and announce in a particular case. 


Id. at 392-94, 117 S.Ct. at 1420-21, 137 L.Ed.2d at 623-24. (footnotes omitted) (emphasis
added). 

 The Richards Court then framed its holding and its context in the following manner:

 In order to justify a "no-knock" entry, the police must have a
reasonable suspicion that knocking and announcing their presence, under the
particular circumstances, would be dangerous or futile, or that it would
inhibit the effective investigation of the crime by, for example, allowing the
destruction of evidence. This standard - - as opposed to a probable-cause
requirement - - strikes the appropriate balance between the legitimate law
enforcement concerns at issue in the execution of search warrants and the
individual privacy interests affected by no-knock entries. 


Id. at 394, 117 S.Ct. at 1421, 137 L.Ed.2d at 624. (emphasis added). Proof necessary to
justify a no-knock entry "is not high," but the police should be required to make it
whenever the reasonableness of a no-knock entry is challenged. Id. at 394-95, 117 S.Ct.
at 1422, 137 L.Ed.2d at 624. As such, the burden of proof to show exigent circumstances
is on the State.

STANDARD OF REVIEW


 We review the denial of a motion to suppress by giving almost total deference to a
trial court's determination of historical facts and reviewing de novo the court's application
of the law. See Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). In
determining whether the trial court's decision is supported by the record, we generally
consider only evidence adduced at the suppression hearing because the ruling was based
on it rather than evidence introduced later. Rachal v. State, 917 S.W.2d 799, 809 (Tex.
Crim. App. 1996). Nevertheless, this general rule is inapplicable where, as in the instant
case, the suppression issue is relitigated by the parties during trial on the merits. Id. 
Then, we assess the trial court's ruling in light of the evidence presented at both the
suppression hearing and the trial. Id. We now turn to the record before us to determine
whether the State met its burden to produce the particularized evidence necessary to justify
the authorities's no-knock entry into appellant's home. 

RECORD EVIDENCE: PARTICULAR CIRCUMSTANCES


 As it is not contested that the authorities failed to knock and announce their presence
at appellant's house prior to their entry, we will proceed with an examination of the record
for evidence of exigent circumstance testimony that would have excused the authorities
from the knock-and-announce requirement. The record before us is virtually peppered
with bits of testimony attempting to explain what led to the authorities securing a warrant
for the search of appellant's house as well as attempts to explain the events leading up to
the raid on appellant's house during the early-morning hours of January 15, 2000. On the
knock-and-announce issue, the facts are basically not in dispute. 

 The record indicates that the authorities received information from a confidential
informant that appellant was about to engage in the process of manufacturing
methamphetamine inside his residence located in San Jacinto County. The lead detective
in the case, Philip Cash of the Montgomery County Sheriff's Office, Special Investigations
Unit, secured a search and arrest warrant from Judge Robert H. Trapp on January 14,
2000. (1) Detective Cash testified that he specialized in clandestine methamphetamine lab
investigations. Detective Cash further stated that after securing the warrant, the authorities
set up surveillance on appellant's house for several hours. Cash described the house as
having a few lights on, the doors and windows were closed, a "listening device" was
mounted on the front door, no dogs were in the yard, there was no fence, and the windows
were covered with a "tarp" hanging from the carport. Significant for our purposes is the
fact that Detective Cash testified that this type of covering of the windows as well as the
"listening device" was typical of clandestine drug labs. The following line of questioning
then occurred: 

 Q.[State] Now based upon your training and experience, if a clandestine lab
operator discovers the approach of somebody from the outside, what
typically[ (2)] happens?


 A.[Cash] They investigate or try to figure out what's going on, who they
are, are they friend or foe.


 Q. And if they think that whoever's approaching is not a friend, what do
they do next typically? 


 A. Flee or arm themselves.


 Q. I'm sorry, arm?


 A. Yes.


 Q. Okay. Now based upon your training and experience in, I guess, these
clandestine labs and executing search warrants, have you received special
training on how to take these places down?


 A. Yes, I have.


 Q. And based upon your experience and training, is there a concern for
weapons?


 A. Yes. In this particular drug - - 


 (Objection omitted).


 Q. Now typically in your investigations of these illegal methamphetamine
labs, why are these labs armed?


 A. Due to the people inside the lab, their paranoia, it's something goes with
the paranoia. They're gonna arm themselves.


 Q. And I think you testified earlier something about people going to rip
them off?


 A. Yes.


 Q. And based upon your training and experience, is that something you've
seen or are aware of?


 A. I've been made aware of it, yes.


 Q. And I guess also because of the creation, is it because of the creation of
these units that you're in, that these clandestine labs are subject to being
raided by the police?


 A. Yes, sir.


 Q. And have you or any of your units that you've worked with encountered
any problems in raiding one of these labs?


 A. Yes, sir, we have.


 Q. Regarding individuals that have armed themselves?


 A. Yes, sir.


 Q. Now if you would for the jury in this particular case, describe your raid
team and the procedure that was used to execute the search warrant?


 A. We went to a predetermined location in Shepherd. Our EMS and the
fire department met us, which we briefed on the entry again. Who is - - you
have to appoint people, the ones that are going in first, you have people that
breach, the one's that have to break doors or windows so the entry team can
get in. In this particular case, we had two officers. One of the officers is
in a Level B, we call space suits the suits with self containing breathing
apparatus, rubber gloves. We were in a rescue mode. If something
happened to the officers or one of the defendants in the house, couldn't
breathe, we were in the safety suit for the chemicals. We had the barrier
against the chemicals to get the officers out safely.


 Q. Now you stated earlier that you assemble the location away from the lab. 
You had the fire department and the EMS there?


 A. Yes, sir. That is standard to clandestine labs.


 (Objection omitted).


 Q. Now is it standard operating procedures to have fire and ambulance
available and in hand while one of these warrants are being executed?


 A. Yes, it is. 


 Q. And why would you want the EMS emergency medical services to be
present?


 A. Due to the problem with the chemicals involved, the chance of violence
at those locations, or someone getting hurt.


 Q. And why would you want the fire department present?


 A. 90 percent, 80 to 90 percent of items found in clandestine labs are
flammable solvents.


 Q. And based on your training, your experience here locally, have you a
knowledge of any of these labs blowing up or catching fire?


 A. Yes. 


 On cross-examination, appellant elicited from Detective Cash that the authorities
were unable to see inside his house prior to the raid. Shortly thereafter, the following
exchange took place: 

 Q.[appellant] Let me ask you, Mr. Cash, on the date of January the 14th of
2000, were you familiar with the knock and announce rule?


 A.[Cash] Not - - no.


 Q. You were not?


 A. No. I've heard of it but I wasn't - - 


 Q. Have you ever practiced, used that? Have you seen that in general
practice?


 A. Yes, I've used it myself.


 Q. And in your - - in the course of your studies, or your seminars and your
work as a law enforcement officer, are you familiar with, with the knock and
announce rule as provided by the - - as interpreted by the United States
Supreme Court?


 A. What I understand about the knock and announce is on certain type of
warrants you do it, on high risk warrants, you don't.


 Later during cross-examination, Detective Cash was asked what the confidential
informant, a James Allen, related to Cash as to when Allen had last been in appellant's
home, and Cash responded that Allen "had been there several times the week prior to that
day." (January 14, 2000). Cash also later admitted that, during the course of their
surveillance, neither he nor any other officers in the raid team detected any odor emanating
from appellant's house that would lead them to believe that methamphetamine was being
manufactured. 

 During the cross-examination of Detective Cash, a rather compelling exchange took
place among the participants - - State's attorney, Cash, appellant, and the trial court. We
characterize it as "compelling" as it appears to neatly frame the subtle, but mandatory,
requirement for proving exigent circumstances allowing authorities to bypass the knock-and-announce requirement: specific facts particular to the accused's circumstances at the
time of the warrant's execution. See Richards, 520 U.S. at 394, 117 S.Ct. at 1416, 137
L.Ed.2d at 624. The exchange appears of record as follows: 

 Q.[appellant] 24 box. Why did you breach my door without knocking and
announcing?


 A. Because of the hazards.


 Q. Sir?


 A. Due to the hazards in clandestine drug labs, the propensity of the
violence to these people, the amount of drugs we recover from these people,
surveillance equipment that are used by these people. The mind set of these
people, the paranoia, they're dangerous people. We consider that a high risk
warrant and we put all these factors together and we'll breach the door for
that reason.

 Mainly officer's safety and the safety of the suspects. Try to prevent
them from getting armed before we can arrest them. 


 Q. And what is it specifically that you observed on my residence or me or
the events that occurred that on - - that on the date that you breached the
door on of my home, what is it that you saw or that occurred at my home
that led you to believe you would not need to knock and announce other than
generally having a guideline?


 A. You talking about prior to breaching the door or after we breached the
door?


 Q. No. I said prior to breaching the door.


 A. The history of people involved in the methamphetamine trade. The
violence associated with those people in the methamphetamine trade had led
us to believe there was a good chance on a methamphetamine lab that you're
gonna run into weapons, security devices, sometimes bombs, trip wires,
numerous other things. It's just the history of the drug, history of the people
that manufacture it. 


 Q. Okay. Now what is it that you saw specifically about my home that led
you to believe that - - wait. That led you to believe that it was justified, a
failure to knock and announce prior to?


 A. I explained the reason.


 Q. Sir?


 A. I explained the reason. 


 Q. There was nothing that you saw at my house.


 THE STATE: Objection, Your Honor argumentative.


 MR. BALLARD: He's being argumentative with the answer.


 THE COURT: Sustained.


 Q. Okay. Have you ever seen me be violent? Have you ever specifically
seen me be violent?


 A. Personally, no.


 Q. Did you see me on January the 14th or 15th being violent?


 A. No.


 Q. Did either one of the defendants, did they resist when - - of the officers
ran inside the house with their guns?


 A. Physically resist, no.


 Q. Was there anything that led you to believe that, or was there anything
that you had knowledge of that led you to believe that there might be an
explosion in that house other than the generalized, what goes on with
suspected methamphetamine cases?


 A. When houses are sealed and they're cooking dope inside, there's a good
chance of an explosion from a gun shot, from friction on the carpet, from
someone lighting a cigarette, a spark, metal hitting metal, it's just the nature
of the beast,


 Q. Okay. Is it uncommon for people to seal their house off like to close
their windows?


 A. Is it uncommon?


 Q. Yeah.


 A. No.


 Q. Is it uncommon to draw the shades, draw their blinds in their house?


 A. It's not uncommon.


 Q. Was it uncommon on January the 14th for the blinds and curtains in my
house to be pulled?


 A. Was it uncommon?


 Q. Yes, sir.


 A. No.


 Q. Okay.


 A. We have - - 


 Q. Were you the one who made the decision on January the - - between
January the 14th and January the 15th, were you the one who made the
decision to breach the door of my house without knocking and announcing?


 A. It was discussed, my commander, myself and the other agents involved
but I, I was the case agent. So I'd been responsible for the tactical end of
it, getting it set up and so forth. Not so much as who was gonna be the point
man but the people, contacting the people to be involved and making sure we
had the equipment and everything needed to do that.


 Q. Okay. And how long have you - - and how long have you been involved
in law enforcement?


 A. Since June of 1988.


 Q. And you were not familiar with the knock and announce rule at that
time?


 A. I wasn't familiar with the Supreme Court that you quoted so, 1997
Supreme Court case, no, I wasn't aware of that.


 Q. Winston versus Wisconsin, that strike anything to you.


 THE STATE: Objection, Your Honor, that's just not relevant.


 THE COURT: Sustained.


 MR. BALLARD: Your Honor, certainly if he has personal knowledge
of that case.


 THE STATE: Your Honor, it's been asked and answered. He started
in on that about an hour and a half ago and he's come full circle again, the
same question's been asked and answered.


 MR. BALLARD: May I ask him the question, Your Honor?


 THE COURT: I sustained his objection, which means no.


The above testimony set the stage for the subsequent "legal crescendo" of an exchange
regarding knock-and-announce moments later, also during cross-examination of Detective
Cash, and reproduced as follows: 

 Q.[appellant] Was there anything unusual or that would create an extingient
(sic) circumstance where my doors were closed to that house?


 A.[Cash] Repeat your question.


 Q. Well was there anything that would create any kind of a circumstance
that would rise to a belief that you would need to breach my door without
knocking and announcing?


 THE STATE: Again Your Honor, that's been asked and answered
probably half a dozen times in the last hour and a half.


 MR. BALLARD: The statement knock and announce has, Your
Honor, but I'm asking him whether or not there would be a circumstance
that would, with my door being closed, that that would rise to a circumstance
that he could ignore the knock an [sic] announce rule.


 THE COURT: Are you isolating it to only your door being closed?


 MR. BALLARD: Well yes, Your Honor. And he hasn't answered
that question.


 THE STATE: It's just a different way to ask the same question[.]


 THE COURT: Yeah. The mere fact, in other words, would the mere
fact that my door was closed.


 MR. BALLARD: But the officer testified that his observations - - his
observations were in setting up a profile that his observations of - - the doors
were closed, the windows were closed, there was no dogs, no fence that that
somehow gave rise to a their [sic] breaching my door without knocking and
announcing. 


 THE COURT: He gave you more reasons than that.


 MR. BALLARD: Other than just his general knowledge and
experience - - other than my home and those were in general terms, they
didn't apply to my home. He spoke in general terms what his experience was
and that - - what I'm trying to get to is the fact that there was nothing, there
was no extingient [sic] circumstance whatsoever for him to ignore the knock
and announce rule.


 THE COURT: Mr. Ballard, he's already stated to you the reason why
he did what he did.


 MR. BALLARD: And I'm trying to ascertain whether or not those - -
there was any extingient [sic] circumstances that were particularized to my
home, Your Honor, opposed to what he has general knowledge of.


 THE STATE: Mr. Cash has already testified to that. Mr. Ballard's
asked that question several times. This is just a different way of asking that
same question.


 THE COURT: The objection is sustained.


 For our purposes in analyzing this issue, it is apparent that both the State and the
trial court were satisfied that Detective Cash's responses to appellant's continued questions
on specificity and particularity of reasons for failing to knock-and-announce provided both
quantity and quality under the applicable law. The record as set out above indicates that
is simply not the case. Time and again appellant tried to get Detective Cash to focus on
appellant's particular circumstances and time and again Detective Cash responded with
generalities and inferences based upon his training and experience with "those people." 
Furthermore, the fact that it is "the nature of the beast" for methamphetamine labs to
explode along with testimony of possible triggering factors in no way explains why
breaching a door without first implementing the knock-and-announce doctrine makes it
more likely that an explosion will be prevented. Could not the unannounced entry of the
raid team cause friction on carpet? Can an unannounced entry prevent an occupant of a
house from lighting a cigarette? Or firing a gun? Or striking a piece of metal with another
piece of metal? All of this is pure speculation and runs dangerously close, in our view,
of creating the type of per se category of criminal investigation the Supreme Court
unanimously rejected in Richards. See Richards, 520 U.S. at 394, 117 S.Ct. at 1416, 137
L.Ed.2d at 624. 

 We will not reproduce other knock-and-announce testimony from other members
of the raid team from the trial testimony as none provide any further enlightenment on the
subject. Neither will we relate or reproduce Detective Cash's testimony from the pretrial
suppression hearing on this issue as it is basically identical to his trial testimony set out
above. We will, however, examine certain other testimony of Detective Cash elicited
during the State's case-in-chief, as well as testimony of James Allen, the confidential
informant, and neighbor of appellant at the time of the raid, elicited during the case for the
defense. We were referred to these portions of testimony by the State in a supplemental
brief on the issue of exigent circumstances submitted at our request. 

 We first set-out the portion of direct examination testimony of Detective Cash
during the State's case-in-chief: 

 Q.[State] Now in all your conversations with Mr. Allen [the confidential
informant] regarding the goings on inside Mr. Allen's house, do you recall
whether you asked Mr. Allen about any firearms that is [sic] Mr. Ballard
may or may not have in his own?


 MR. BALLARD: Your Honor, I'm gonna object at this time. Object
that it's hearsay.


 THE STATE: I'm asking Mr. Cash if he remembers asking Mr. Allen
whether or not there were any guns in the house, not what Mr. Allen said.


 THE COURT: Yeah. All right. You remember asking not what he
said.


 A. I recall talking to Mr. Allen about it but I don't remember when it was. 
It was either before or after the search warrant.


 Q. Now you do recall a conversation with Mr. Allen about firearms and - -


 MR. BALLARD: Your Honor, he's leading the witness.


 A. Yes, I do.


 THE STATE: I just asked if he recalls the conversation. He doesn't
know if he doesn't remember the conversation.


 MR. BALLARD: And he's leading the witness by predicating if he
recalls the conversation and then predicating what he wants this man to
testify to.


 THE STATE: Just trying to clarify for the jury. On cross
examination he went into great lengths about whether or not he had any
firearms in the house.


 THE COURT: Objection overruled. Let's proceed.


 Q. You just don't know, do you know exactly when it was before or after?


 A. No, I don't recall that.


 Q. Do you recall the conversation regarding firearms?


 A. Yes.


 THE STATE: Pass the witness.


At most, all this testimony indicates is that Detective Cash recalled a conversation with
Mr. Allen about whether appellant "may or may not" have had firearms in his house. The
State does not direct our attention to anywhere in the record supporting its representation
to the trial court that appellant's cross-examination of Cash "went to great lengths"
concerning firearms in his house. At any rate, this is the extent of the State's evidence
from any law enforcement officer involved in the investigation of appellant regarding
"knowledge" of firearms in appellant's house.

 We are next directed to the cross-examination testimony of James Allen elicited by
the State during the case-in-chief for the defense. We reproduce it as it appears in the
record:

 Q.[State] Now prior to Mr. Cash and the rest of the task force executing the
search warrant on Mr. Ballard's home, do you recall whether or not you had
any conversations with Philip Cash about any guns that might have been in
Mr. Ballard's house? 


 A.[Allen] Yes, sir. He asked me one time. I can't remember what time that
was, about three or four months of the conversation, he asked me if he had
any guns in the house and I said not that I recall. I know that he had one,
I believe it was a nine millimeter. It was all tore apart and he needed a part
for it. I knew it wasn't in working condition. Other than that, I don't think
he had any other weapons in there.


 Q. But you do recall a conversation with Mr. Cash where you did describe
that he did have a gun?


 A. Just that nine millimeter.


 Q. All right.


 A. It was either a nine millimeter or a .44, I'm not real sure what it was.


 Q. Revolver or automatic?


 A. I don't even know if I ever seen it or not, to tell you the truth, he just
talked about I needed some parts for it.


 We fully recognize that Richards and its progeny emphasize the State's proof of
particular exigent circumstances justifying a no-knock entry is "not high," Richards, 520
U.S. at 394, 117 S.Ct. at 1422, 137 L.Ed.2d at 624, but the proof must at least indicate
an unequivocal knowledge on the part of the authorities of the particular exigent
circumstance(s) asserted. The first part of James Allen's testimony stated that he told
Detective Cash that he [Allen] did not recall appellant having any guns in his house. Then
the emphasized portion of Allen's testimony consists entirely of Allen's personal
knowledge of a handgun belonging to appellant. There is no indication that the existence
of the "nine millimeter" was also known by Detective Cash. Finally, Allen cannot recall
if the handgun was actually a nine millimeter or a ".44," with Allen concluding his
testimony on this point by admitting that he may have never actually seen a weapon but
may have only been told of such a weapon by appellant. At any rate, Allen appeared to
have believed the handgun was not functional. Additionally, the mere presence of a
handgun, functional or not, is insufficient, as an exigent circumstance exception to the
knock-and-announce rule, where the State does not also prove the authorities possessed
information that the individual(s) subject to the warrant was likely to use the weapon, was
likely to become violent, had a criminal record reflecting violent tendencies, or a verified
reputation of a violent nature. See United States v. Bates, 84 F.3d 790, 795-96 (6th Cir.
1996). (3) The record before us does not indicate that appellant was known to be violent or
to have ever exhibited violent tendencies. 

 The combined testimony of Detective Cash and James Allen, proffered to us by the
State, consists of unparticularized recollections which, we believe, do not amount to the
proof necessary to justify the no-knock entry made by the authorities on appellant's house. 
Furthermore, in the reproduced portions of testimony set-out earlier in this opinion, we
attempted to emphasize the extensive generalizations that made up the entirety of Detective
Cash's rationale for a no-knock entry. Again, the Supreme Court in Richards was fully
aware of the real-life "horrors" facing authorities in felony drug investigations. 
Nevertheless, the Court essentially condemned carving out "special circumstances of
today's drug culture" as a basis for abandoning the knock-and-announce rule. Richards, 
520 U.S. at 392, 117 S.Ct. at 1420, 137 L.Ed.2d at 623. 

 The evidence before us implicates the two concerns the Richards Court discussed:
1) considerable overgeneralization, and 2) the chameleon-like nature of per se, or
categorical, exceptions to the knock-and-announce rule. Id. at 393-94, 117 S.Ct. at 1421,
137 L.Ed.2d at 623-24. The State would simply have us carve out a no-knock exception
for "clandestine methamphetamine labs" as they pose a danger of explosion and the release
of toxic gases. Is this "nature of the beast" any more dangerous to authorities executing
a search or arrest warrant at a dwelling than the generalized litany of weapons and other
protective devices that are "typically found" in houses belonging to felony drug possessors,
dealers, or manufacturers? See State v. Richards, 201 Wis. 839, 549 N.W.2d 218, 223-27
(1996) (extensive discussion by Wisconsin Supreme Court on the dangers to authorities
executing search warrants). Under the record before us, the State has failed to carry its
burden to provide adequate evidence to justify its no-knock entry of appellant's house. 
The trial court abused its discretion in denying appellant's motion to suppress on that basis.

 Having found constitutional error in the admission of the evidence in question, we
must reverse the conviction unless we conclude beyond a reasonable doubt that the error
made no contribution to the conviction or the punishment. Tex. R. App. P. 44.2(a). In
the instant case, the complained-of evidence includes the methamphetamine which
appellant was charged with manufacturing. As such, the error contributed to appellant's
conviction. See McQuarters v. State, 58 S.W.3d 250, 258 (Tex. App.--Fort Worth 2001,
pet. ref'd). We sustain Issue Two. (4) We reverse the judgement of the trial court and
remand the cause to said court for further proceedings.

 REVERSED AND REMANDED. 


 ____________________________

 STEVE MCKEITHEN

 Chief Justice 


Submitted on March 20, 2003

Opinion Delivered May 14, 2003

Publish


Before McKeithen, C.J., Burgess and Gaultney, JJ.














DISSENTING OPINION



 I respectfully dissent. The showing necessary to justify a no-knock entry is not
high. Richards v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416, 1422 137 L.Ed.2d 615
(1997). In Richards, the Supreme Court described the required showing as follows:

 In order to justify a "no-knock" entry, the police must have a reasonable
suspicion that knocking and announcing their presence, under the particular
circumstances, would be dangerous or futile, or that it would inhibit the
effective investigation of the crime by, for example, allowing the destruction
of evidence.


Id., 520 U.S. at 394. Detective Cash testified to various dangers associated with
methamphetamine production: explosions, violence, weapons, trip wires, and bombs. The
particular circumstances here included specific information from an informant that Ballard
would be manufacturing, or "cooking," methamphetamine at the time of the raid, and the
house was "sealed." Detective Cash explained that when these two circumstances are
present, "there's a good chance of an explosion" from a gunshot or other spark. Detective
Cash also explained that a no-knock entry prevents a methamphetamine manufacturer from
arming himself before he can be arrested. The State had evidence defendant had a gun; 
the State was not required to assume the gun was in disrepair. A fire truck was present
in the event of an explosion, and some of the officers had on protective chemical suits. 
Under the specific circumstances presented, the no-knock entry was justified by a
reasonable suspicion that knocking and announcing would be dangerous or would inhibit
the effective investigation of the crime in progress -- the manufacture of methamphetamine. 
The trial court's decision should not be reversed. 

 _________________________________

 DAVID B. GAULTNEY

 Justice

Dissent Delivered

May 14, 2003

Publish
1. Neither the warrant itself or the probable cause affidavit are of any help at all to
the State with regard to particularized proof of exigent circumstances excusing the knock-and-announce requirement. 
2. Any emphasis appearing in quoted testimony from the record before us is of our
doing unless otherwise indicated.
3. For the average person, it is lawful to possess firearms within one's home in Texas,
not to mention possess concealed handguns if licensed, the additional proof of a suspect's
violent past and/or violent tendencies seems necessary in order to declare a no-knock entry
reasonable under the Fourth Amendment. Indeed, a finding of exigency from the mere
presence of a handgun in a dwelling would effectively sanction a no-knock entry in every
drug case in Texas. See Price v. State, 93 S.W.3d 358, 368 (Tex. App.--Houston [14th
Dist.] 2002, pet. filed).
4. Having sustained Issue Two, we decline to address the remaining two issues as they
can afford no greater relief to appellant should they also be sustained.